# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAD LEE YOUNG, JR., | |
| Plaintiff, | Case No. 1:22-cv-00576-SKO |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| | (Doc. 1) |
| _____/ | |

## I.     INTRODUCTION

Plaintiff Thad Lee Young, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Acting Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1383(c).  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.     BACKGROUND

Plaintiff protectively filed an application for SSI payments on November 15, 2019, alleging disability beginning June 1, 2007,[2] due to social anxiety disorder.  (Administrative Record ("AR")

---

[1] The parties have consented to the jurisdiction of the U.S. Magistrate Judge.  (*See* Doc. 10.)
[2] During the hearing, Plaintiff amended the alleged onset date to the filing date, November 15, 2019.  (*See* AR 15, 35.)

15, 50, 61, 75, 88.) Plaintiff was born on July 14, 1968, has at least a high school education, and has no past relevant work. (AR 24, 32, 50, 57, 60.)

**A.      Relevant Evidence of Record[3]**

     **1.      Medical Evidence**

In January 2020, Plaintiff presented at Family Healthcare Network reporting symptoms of anxiety, depression, and insomnia. (AR 288.) He stated his symptoms started when he was in prison, where he was treated effectively with medication, but he has struggled since he was released. (AR 288.) The provider prescribed medication for his anxiety and insomnia and directed Plaintiff to return for a follow-up appointment. (AR 289.) He returned in February 2020, and stated he had been sleeping better, but he still had anxiety and felt agoraphobic. (AR 291.) Plaintiff requested a refill of his current medications and inquired about the possibility of additional medication that could help manage his anxiety. (AR 291.) The provider added a new medication for anxiety and directed Plaintiff to return in four weeks. (AR 292.)

In March 2020, Plaintiff attended a follow-up appointment for management of his mental health treatment. (AR 367.) He reported tolerating his medications well, feeling much better, and that his anxiety was under control. (AR 367.) Plaintiff requested to continue the current medication regimen. (AR 367.) The provider noted that Plaintiff's anxiety level sounded better and refilled his medications. (AR 368.)

In March 2020, Plaintiff presented at Omni Family Health complaining of "moderate" left wrist pain. (AR 324.) Upon conducting a physical examination, the provider noted mildly decreased range of motion with pain as to Plaintiff's left wrist. (AR 328.) In April 2020, Plaintiff reported falling off a ladder and hurting his left knee. (AR 331.) He stated his pain was at a ten out of ten, and he had swelling and bruising. (AR 331.) The provider noted ecchymosis and edema as to Plaintiff's left knee, but also that Plaintiff's functional status had not changed. (AR 334–35.) As for Plaintiff's psychiatric symptoms, the provider observed that Plaintiff was not agitated or anxious, and he exhibited appropriate mood and affect, no paranoia, and normal attention span and

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

concentration. (AR 335.) The provider ordered an x-ray for Plaintiff's knee, prescribed Plaintiff medication for pain and inflammation, and noted that there would be an MRI on Plaintiff's left wrist. (AR 335–36.)

The MRI of Plaintiff's left wrist was conducted in May 2020. (AR 338.) The MRI revealed intermediate grade sprains of the dorsal bands of the scapholunate ligament and of the dorsal intercarpal ligament, but also intact triangular fibrocartilage and no fractures. (AR 338.) In June 2020, the provider at Omni Family Health referred Plaintiff to physical therapy for his left wrist. (AR 391.) Plaintiff started physical therapy shortly thereafter and experienced significant improvement in his range of motion to the point where he was able to work with an air compressor all day with minimal discomfort. (*See* AR 414–22.) The provider also ordered several diagnostic evaluations for Plaintiff's left knee, including an x-ray. (AR 395.)

In July 2020, Plaintiff reported that his knee pain was intermittent and fluctuating, but was relieved by use of a brace or splint and by elevation. (AR 398.) The x-ray of Plaintiff's knee in July 2020 revealed mild patellofemoral compartment osteoarthritis, but no fracture or significant effusion, and the medial and lateral compartment joint spaces were normal. (AR 405.) Physical examinations in September 2020 revealed tenderness medially and moderate pain with motion. (AR 591, 598.) A CT scan of Plaintiff's knee indicated no fractures, but the soft tissues of Plaintiff's knee were not well visualized in the imaging. (AR 601.) Another physical examination conducted in October 2020 indicated swelling and mild pain with motion. (AR 605.)

Throughout the rest of 2020, providers noted normal mental examination findings during Plaintiff's psychiatric evaluations, including appropriate mood and affect, normal insight, and normal judgment. (*See* AR 598, 604, 611, 618.) In March 2021, Plaintiff stated his agoraphobia was worsening, but otherwise reported no other symptoms. (AR 445.) In April 2021, Plaintiff stated he felt "much better" since he began taking medication, expressed interest in behavioral health resources, and again reported no other symptoms. (AR 439.) Later that month, however, Plaintiff requested counseling to lower his panic attacks and agoraphobia. (AR 433.) He stated he tried to avoid crowds and he mostly spent time alone by riding his motorbike into the mountains or going to the lake. (AR 433.) Plaintiff's psychological examination during that same visit indicated

he appeared anxious and his mood seemed depressed, but also that his cognitive function was intact, his speech was clear, and his thought process was logical and linear. (AR 434.)

### 2. Opinion Evidence

In March 2020, R. Paxton, M.D., state agency consultant, reviewed the record and assessed Plaintiff's mental residual functional capacity ("RFC").[4] (AR 53–56.) Dr. Paxton found Plaintiff was capable of sustaining adequate concentration, persistence, and pace for simple, routine tasks in an environment with limited public contact. (AR 56.) Upon reconsideration in July 2020, another state agency consultant, Elizabeth Covey, Psy.D., reviewed the record and agreed that Plaintiff appeared capable of maintaining concentration, persistence, and pace for short and simple instructions throughout a normal workday or workweek. (AR 71–72.) Dr. Covey also found that Plaintiff appeared capable of superficial interactions with supervisors and coworkers with limited interactions with the public. (AR 71–72.)

In August 2020, R. Fast, M.D., state agency consultant, reviewed the record and assessed Plaintiff's physical RFC. (AR 68–70.) Dr. Fast found that Plaintiff could perform light exertional work due to his "chronic left wrist sprain and recent knee sprain" with an additional finding of osteoarthritis. (AR 68–70.) Dr. Fast also found that Plaintiff's postural limitations included frequent climbing of ramps, stairs, ladders, and scaffolds, as well as frequent kneeling, crouching, and crawling. (AR 69.)

## B. Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on April 6, 2020, and again on reconsideration on August 25, 2020. (AR 57–59, 72–75, 88–89.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 94.) The ALJ conducted a hearing on June 1, 2021. (AR 30–49.). Plaintiff appeared at the hearing with his

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

4

counsel and testified. (AR 36–43.) A vocational expert ("VE") also testified. (AR 43–48.)

**C.     The ALJ's Decision**

In a decision dated June 24, 2021, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 15–25.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 17–25.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 15, 2019, the application date (step one). (AR 17.) At step two, the ALJ found the following impairments severe: degenerative joint disease of the left knee, bilateral hearing loss, and panic disorder. (AR 17.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 18–20.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

> to perform medium work as defined in 20 CFR [§] 416.967(c) except he can occasionally kneel, crawl, and climb ladders, ropes, or scaffolds, and he can work in no louder than a moderate noise work environment. [Plaintiff] can perform simple, routine tasks, make simple work related decisions, adapt to occasional changes in the work routine, and have occasional interaction with the public, but he cannot work at a production rate pace.

(AR 20.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 21.)

The ALJ determined that Plaintiff had no past relevant work (step four) and that, given his RFC, he could perform a significant number of jobs in the national economy, specifically cleaner, sandwich maker, and mail carrier (step five). (AR 24–25.) The ALJ concluded that Plaintiff was not disabled since November 15, 2019, the application date. (AR 25.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on March 14, 2022. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the

5

Commissioner. 20 C.F.R. § 416.1481.

## III. LEGAL STANDARD

### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of

the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.     Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

*Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.   DISCUSSION

Plaintiff contends that the ALJ erred in discounting the medical opinions of Drs. Paxton, Covey, and Fast. (Doc. 15 at 9–13; Doc. 17 at 1–4.) The Acting Commissioner responds that the ALJ's consideration of these three doctor's opinions was proper and supported by substantial evidence. (Doc. 16 at 8–12.) The Court agrees with the Acting Commissioner.

### A.   The ALJ's Treatment of Dr. Paxton's, Dr. Covey's, and Dr. Fast's Opinions Was Not Erroneous

#### 1.   Legal Standard

Plaintiff's claim for SSI is governed by the agency's "new" regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017. 20 C.F.R. § 416.920c. The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness. 20 C.F.R. § 416.920c(b)(2). And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, ALJs must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions." 20 C.F.R. § 416.920c(a)–(b).

Recently, the Ninth Circuit issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

1 *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). Accordingly, under the new regulations, "an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id*. at 787.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [it] considered the supportability and consistency factors' in reaching these findings." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)); *see also id*. § 416.920c(b). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods*, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)); *see also id*. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Woods*, 32 F.4th at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)); *see also id*. § 416.920c(c)(2).

> As the Ninth Circuit also observed,
>
> The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion. *See id.* § 404.1520c(c)(3). Thus, an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. *Id*. § 404.1520c(c)(3)(i)–(v). However, the ALJ no longer needs to make specific findings regarding these relationship factors[.]

*Woods*, 32 F.4th at 792. "A discussion of relationship factors may be appropriate when 'two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same.'" *Id*.; *see also* 20 C.F.R. § 416.920c(b)(3). "In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'" *Woods*, 32 F.4th at 792. Finally, if the medical opinion includes evidence on an issue reserved to the Commissioner, the ALJ need not provide an analysis of the evidence in their decision, even in the discussions required by 20 C.F.R. §§ 404.1520c, 416.920c. *See* 20 C.F.R. § 404.1520b(c)(3).

With these principles in mind, the Court reviews the weight given to Drs. Paxton's, Covey's, and Fast's opinions.

**2. Analysis**

    a. <u>Drs. Paxton and Covey</u>

In weighing Dr. Paxton's and Dr. Covey's opinions related to Plaintiff's mental functioning, the ALJ reasoned as follows:

> At the initial state level in March 2020, psychiatric consultant R. Paxton, M.D. determined [Plaintiff] was capable of sustaining adequate concentration, persistence, and pace for simple, routine tasks in an environment with limited public contact (Exhibit 1A/7). At the state reconsideration level in July 2020, psychological consultant Elizabeth Covey, Psy.D. agreed [Plaintiff] could maintain concentration, persistence, and pace for short and simple instructions throughout a normal workday and workweek (Exhibit 3A/12-13). Dr. Covey also agreed that [Plaintiff] was capable of only limited interaction with the public, but she also concluded [Plaintiff] was only capable of superficial interaction with coworkers and supervisors, and that he had some adaptation limitations (<u>Id</u>.). Noting the general agreement between the two psychologists with regard to [Plaintiff's] ability to engage in simple, routine tasks on a regular and ongoing basis, their opinions each contain significant inconsistencies that challenge their persuasiveness. For instance, Dr. Paxton provided no objective support whatsoever for his opinion, as he did not cite a single medical record during his analysis (Exhibit 1A/4-7). Then, Dr. Covey cited new evidence showing significant improvement in [Plaintiff's] symptoms with treatment, but then she inexplicably concluded that [Plaintiff] had greater mental limitations than he had when he was symptomatic in early 2020 (Exhibit 3A/8). Moreover, both psychologists used the undefined term "limited" with regard to [Plaintiff's] ability to tolerate exposure to the public, which is vague and therefore open to interpretation, further detracting from the persuasiveness of the state level opinions. On top of those consistency issues, given [Plaintiff's] amendment of the alleged onset date at the hearing level and the additional medical evidence the state psychologists did not have access to during their respective reviews, I found their opinions lacked longitudinal support. Indeed, I largely disregarded Dr. Paxton's opinion because of the total lack of objective citation in his analysis, leaning much more heavily on Dr. Covey's review and analysis. I therefore adopted the limitation to simple, routine tasks Dr. Covey suggested, but I otherwise found these opinions to be largely unpersuasive, and I assigned mental limitations commensurate with the complete objective evidence available at the hearing level.

(AR 23.)

The Court concludes that the ALJ properly evaluated the supportability and consistency of Dr. Paxton's and Dr. Covey's opinions. As to supportability, the ALJ appropriately considered both doctors' failures to adequately explain their reasoning. *See* 20 C.F.R. § 404.1520c(c)(1) (requiring the ALJ to consider "supporting explanations presented by a medical source."); *accord Wilson v. Kijakazi*, No. 1:20–cv–01753–SKO, 2022 WL 3908428, at *9 (E.D. Cal. Aug. 30, 2022).

As the ALJ observed, Dr. Paxton failed to cite to any medical record in his analysis; his opinion was cursory in nature and did not contain any objective support. (AR 23 (citing AR 53–56).) Similarly, the ALJ noted Dr. Covey's opinion did not sufficiently explain why she concluded Plaintiff had greater mental limitations than when he was symptomatic in early 2020 in light of her citations to new evidence showing significant improvement in his symptoms with treatment. (AR 23 (citing AR 67).) Indeed, in March 2020, Plaintiff reported tolerating his medications well, feeling much better, that his anxiety was under control, and requested to continue his current medication regimen. (AR 367–68.) The lack of supporting explanations was a proper consideration in evaluating the supportability of Drs. Paxton's and Covey's opinions and finding them "largely unpersuasive." *See* 20 C.F.R. § 404.1520c(c)(1); *see, e.g.*, *Woods*, 32 F.4th at 794 (substantial evidence supported finding that medical opinion, expressed in a "fill-in-the-blank questionnaire," was "not persuasive because it is not supported by any explanation" or "pertinent exam findings."); *Ponce v. Comm'r of Soc. Sec.*, No. 1:20-cv-01664-EPG, 2022 WL 196529, at *3 (E.D. Cal. Jan. 21, 2022) (declining to find the ALJ erroneously rejected medical opinion where given on a "checkbox form with no significant narrative explanation" and "no citation to record evidence.").

As to consistency, the ALJ found Drs. Paxton's and Covey's opinions concerning Plaintiff's mental limitations were generally inconsistent with the medical record, particularly in light of Dr. Paxton's lack of citation to objective medical evidence and Plaintiff's "amendment of the alleged onset date at the hearing level and the additional medical evidence the state psychologists did not have access to during their respective reviews." (AR 23.) Although the ALJ did not cite to any records in connection with this finding, the preceding paragraphs contain a summary of medical records with specific citations and explanation. (*See* AR 20–22.) For example, the ALJ provided the following analysis of the medical evidence relating to Plaintiff's mental functioning, much of which post-dated Drs. Paxton's and Covey's medical opinions:

> Based on the objective evidence, I find [Plaintiff] can perform simple, routine tasks and make simple work related decisions. In making this finding, I considered the effects of [Plaintiff's] panic disorder, which generally express themselves through signs of anxiety according to the examination records. However, I also noted [Plaintiff's] generally normal cognitive presentation during examinations, as well as

11

> the findings throughout 2020 that he had normal attention, concentration, memory, and judgment – all of which weigh against more restrictive findings in the complexity of work he can perform or decisions he can make. [Plaintiff's] periodic anxiety also persuaded me that he could only adapt to occasional changes in the work routine, and that he could not work at a production rate pace, as both could cause or exacerbate his anxiety or panic. Finally, because of his early reports of difficulty being around groups of people and his solitary activities in 2021 when his symptoms flared up again, I find [Plaintiff] can have only occasional interaction with the public. Again, however, the objective evidence shows [Plaintiff] to be generally cooperative, without signs of mood swings, abnormal or inappropriate behavior, or other deficits that could affect his ability to get along with others. Indeed, in general, I strongly considered the significant improvement in his symptoms just two months after he first sought mental health treatment. Once he established medication management, the examination findings were normal for an entire year until the recurrence of [Plaintiff's] anxiety in March and April 2021, and even then, the findings were mostly normal. The mental residual functional capacity I assigned adequately addresses the objective medical evidence regarding [Plaintiff's] panic disorder by reducing factors that could cause or worsen his anxiety.

(AR 21–22.)

As described by the ALJ, Plaintiff reported significant improvement regarding his anxiety after just two months of mental health treatment and starting medication (*see* AR 288–89, 291–92, 367–68). *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits."). Specifically, Plaintiff was prescribed medication for his anxiety and insomnia when he first presented at Family Healthcare Network in January 2020. (AR 288–89.) When he returned in February 2020, Plaintiff he stated he had been sleeping better, but he still had anxiety and felt agoraphobic. (AR 291.) At Plaintiff's request, the provider added a new medication for anxiety. (AR 292.) When Plaintiff returned in March 2020, he reported tolerating his medications well, feeling much better, that his anxiety was under control, and requested to continue his current medication regimen. (AR 367–68.) The provider noted that Plaintiff's anxiety level sounded better and refilled his medications. (AR 368.) Though Plaintiff indicated his agoraphobia was worsening in March 2021, he repeatedly reported no other symptoms and satisfaction with his medication regimen. (*See* AR 436, 439, 445.)

Accordingly, the ALJ's findings that Drs. Paxton's and Covey's opinions were not fully supported and inconsistent with the longitudinal record as a whole were legally sufficient and

supported by substantial evidence. The fact that Plaintiff's course of treatment, for example, could be interpreted differently has no effect on this Court's ruling. *See Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citations omitted); *accord Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion."); *see, e.g., Villalon v. Kijakazi*, No. 1:20-cv-01830-SKO, 2022 WL 4388264, at *8 (E.D. Cal. Sept. 22, 2022) (finding the ALJ's decision to find a medical opinion unpersuasive was supported by substantial evidence where the evidence post-dating the provider's opinion was inconsistent with her opinion regarding the plaintiff's ability to interact with others).

Moreover, Plaintiff does not specify what additional functional limitations resulting from his mental impairments were not accounted for in the ALJ's RFC assessment. Indeed, the ALJ accommodated Plaintiff's mental illnesses by limiting him to simple, routine tasks as Dr. Covey suggested (*see* AR 23), and further limited him to making simple work-related decisions, adapting to occasional changes in the work routine, and having occasional interaction with the public, but with a compete restriction on working at a production rate pace (AR 20). Plaintiff may disagree with the RFC, but the Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the evidence. *See Ford v. Saul*, 950 F.3d 1141, 1159 (9th Cir. 2020) ("Our review of an ALJ's fact-finding for substantial evidence is deferential"); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

      a.    <u>Dr. Fast</u>

In weighing Dr. Fast's opinion related to Plaintiff's physical functioning, the ALJ reasoned as follows:

> At the state reconsideration level in August 2020, medical consultant R. Fast, M.D. determined [Plaintiff] could perform light exertional work, wherein he could frequently kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds, while he could frequently handle with his left upper extremity (Exhibit 3A/9-10). With regard to consistency and supportability, Dr. Fast attempted to address [Plaintiff's] left wrist "chronic sprain," but the medical consultant failed to

note the significant improvement the claimant experienced with physical therapy by mid-2020, and the total lack of treatment for the impairment after that point (Exhibits 3F and 7F). The medical consultant also considered [Plaintiff's] left wrist impairment in recommending a light exertional finding, whereas the longitudinal evidence shows [Plaintiff] had generally full strength in his extremities after he completed physical therapy (Exhibits 3F, 6F, 7F, 11F, and 12F). Dr. Fast's opinion regarding [Plaintiff's] left arm limitations therefore does not accurately represent the longitudinal evidence after his review, since the impairment did not meet the duration requirement to be considered severe. Removing that impairment from the review supports fewer exertional limitations and therefore a medium exertional finding. Dr. Fast cited [Plaintiff's] recent knee sprain and findings of osteoarthritis on radiographic imaging, but he did not address the prescription for a knee brace, which occurred after his review (Exhibit 12F/2-5). The bracing recommended to treat [Plaintiff's] left knee joint persuaded me that the knee-centric postural activities Dr. Fast addressed could only be performed on an occasional basis, rather than frequent. For the reasons above, I found only particular pieces of Dr. Fast's opinion to be consistent and supported enough to be persuasive.

(AR 23–24.)

The Court finds that the ALJ also properly evaluated the supportability and consistency of Dr. Fast's opinion. Regarding supportability, as with Dr. Covey, the ALJ appropriately considered Dr. Fast's failure to adequately explain his reasoning. *See* 20 C.F.R. § 404.1520c(c)(1); *accord Wilson*, 2022 WL 3908428, at *9. The ALJ noted Dr. Fast's opinion did not sufficiently explain why he concluded that Plaintiff could only perform light exertional work, without addressing Plaintiff's improvement with physical therapy as to his left wrist and lack of treatment thereafter. (AR 23 (citing AR 299–366; 391–432).) For example, despite his descriptions of "chronic" left wrist pain, Plaintiff reported experiencing significant improvement in the range of motion as to his left wrist due to physical therapy, to the point where he was able to work with an air compressor all day with minimal discomfort. (*See* AR 414–22.) The lack of supporting explanation was a proper consideration in evaluating the supportability of Dr. Fast's opinion. *See* 20 C.F.R. § 404.1520c(c)(1); *Woods*, 32 F.4th at 794; *Ponce*, 2022 WL 196529, at *3.

As to consistency, the ALJ appropriately found that Dr. Fast's opinion was somewhat inconsistent with the other medical evidence in the record. For example, as to Plaintiff's wrist, the ALJ cited evidence in the record showing Plaintiff generally had full strength in his extremities after completing physical therapy and did not seek further treatment. (AR 23; *see also* AR 414–

22.) Similarly, as to Plaintiff's left knee, the ALJ found that evidence of bracing as to Plaintiff's left knee, which post-dated Dr. Fast's opinion, supported an even more limited finding than that found by Dr. Fast as to Plaintiff's "knee-centric postural activities." (AR 23–24.) Specifically, Dr. Fast opined that Plaintiff's postural limitations included *frequent* climbing of ramps, stairs, ladders, and scaffolds, as well as frequent kneeling, crouching, and crawling. (AR 69.) The ALJ determined that Plaintiff's prescription for a knee brace "persuaded" them to further limit Plaintiff to only *occasional* postural activities. (AR 23–24.) Indeed, in July 2020, Plaintiff reported that his knee pain was intermittent and fluctuating, but also that his pain was effectively treated with bracing and elevation. (AR 398.) The x-ray of Plaintiff's knee in July 2020 revealed mild patellofemoral compartment osteoarthritis, but no fracture or significant effusion, and the medial and lateral compartment joint spaces were normal. (AR 405.) In light of the effectiveness of the treatment for Plaintiff's left knee, it was reasonable for the ALJ to conclude that the record did not support the severity of the restriction opined by Dr. Fast. *See Warre*, 439 F.3d at 1006; *see, e.g., Wilson*, 2022 WL 3908428, at *11; *Villalon*, 2022 WL 4388264, at *8. Taking into account the longitudinal evidence in the record, the ALJ appropriately limited Plaintiff to occasional, rather than frequent, knee-centric postural activities. (AR 23–24

In sum, the ALJ's finding that Dr. Fast's opinion was only partially supported and consistent with the longitudinal record as a whole was legally sufficient and supported by substantial evidence. As noted above, the fact that the evidence as to Plaintiff's physical impairments could be interpreted differently has no bearing on this Court's ruling. *See Andrews*, 53 F.3d at 1039–40; *Batson*, 359 F.3d at 1198; *see, e.g., Villalon*, 2022 WL 4388264, at *8. And, Plaintiff does not specify what additional functional limitations resulting from his physical impairments were not accounted for in the ALJ's RFC assessment. As discussed above, the ALJ accommodated Plaintiff's physical impairments, such as his left knee injury, by limiting him to occasional, rather than frequent, knee-centric postural activities as opined by Dr. Fast. (AR 23–24.) Plaintiff may disagree with the RFC, but the Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the evidence. *See Ford*, 950 F.3d at 1159; *Thomas*, 278 F.3d at 954.

## V. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: __**August 18, 2023**__                  /s/ *Sheila K. Oberto*
                                                UNITED STATES MAGISTRATE JUDGE